# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

KASHARD O. BROWN,

                              Petitioner,

v.

BRIAN E. WILLIAMS, SR. et al.,

                              Respondents.

Case No.: 2:11-cv-01058-JCM-DJA

**ORDER**

Kashard Brown, a Nevada prisoner, filed a petition for writ of habeas corpus (ECF No. 31) under 28 U.S.C. § 2254. This court denies Brown's habeas petition, grants him a certificate of appealability for Ground 1(b) only, and directs the clerk of the court to enter judgment accordingly.

## I.     BACKGROUND

Brown's convictions are the result of events that occurred in Clark County, Nevada on September 8, 2001. (ECF No. 3-2 at 34.) In its order affirming Brown's convictions, the Nevada Supreme Court described the crime, as revealed by the evidence at Brown's trial, as follows:

> For approximately eight years, Brown and Rebekah Joy Hanson were involved in a turbulent and sporadic relationship. On September 8, 2001, Hanson was killed by a shotgun blast to the back of her head. Brown maintained that he came home and thought an intruder was in his apartment. He grabbed a shotgun, which accidentally discharged and killed Hanson. The State asserted that the shooting was intentional and motivated by jealously and rage over Hanson's decision to finally end the relationship with Brown.

(ECF No. 12-2 at 16.)

Following a jury trial, Brown was found guilty of possession of a short-barreled shotgun and first-degree murder with the use of a deadly weapon. (ECF No. 12-1 at 28.) Brown was sentenced to 12 to 36 months for the possession conviction and life without the possibility of parole for the murder conviction plus a consecutive term of life without the possibility of parole for the deadly weapon enhancement. (*Id.* at 28-29.) Brown appealed, and the Nevada Supreme Court reversed on September 3, 2004, finding that the jury was not properly instructed on the State's burden of proof concerning Brown's defense. (ECF No. 12-2 at 16-19.) The Nevada Supreme Court later granted a petition for rehearing, vacated its prior order, and affirmed the judgment of conviction. (ECF No. 12-2 at 66, 68-78.) Remittitur issued on November 29, 2005. (ECF No. 12-3 at 23.)

Brown filed a counseled state habeas petition and an amended petition on November 21, 2006, and October 22, 2007, respectively. (ECF Nos. 13-1 at 17, 13-2 at 73.) The state district court denied the petition on January 16, 2009. (ECF No. 16-2 at 44-50.) Brown appealed, and the Nevada Supreme Court affirmed on April 28, 2011. (ECF No. 19-1 at 65.)

Brown's federal habeas petition and counseled amended petition were filed on June 27, 2011, and February 28, 2012, respectively. (ECF Nos. 1, 31.) The respondents moved to dismiss Brown's petition on August 20, 2012. (ECF No. 42.) This court granted the petition, in part, finding that Ground 1(b) was unexhausted and dismissing Ground 6 as procedurally defaulted. (ECF No. 59.) In response, Brown moved for a stay and abeyance, which this court granted, ordering that this action was stayed pending exhaustion of Ground 1(b). (ECF Nos. 60, 68.)

Brown returned to state district court and filed his second state habeas petition on March 7, 2014. (ECF No. 71-1.) The state district court dismissed the petition on October 14, 2014. (ECF

No. 71-6.) Brown appealed, and the Nevada Supreme Court affirmed on March 17, 2016. (ECF No. 71-16.) Remittitur issued on April 29, 2016. (ECF No. 71-17.)

Brown moved to reopen his federal habeas action on June 7, 2016. (ECF No. 70.) This court granted the motion. (ECF No. 72.) The respondents again moved to dismiss Brown's petition on December 5, 2016. (ECF No. 79.) This court denied the motion and deferred consideration of whether Brown could demonstrate cause and prejudice to overcome the procedural default of Ground 1(b) until after the filing of an answer and reply. (ECF No. 89.) The respondents answered Brown's petition on August 7, 2019, and Brown replied on April 13, 2020. (ECF Nos. 100, 112.)

In his remaining grounds for relief, Brown alleges the following violations of his federal constitutional rights:

| | |
|---|---|
| 1(a). | His trial counsel failed to interview, investigate, or call Donna Lang as a witness. |
| 1(b). | His trial counsel concealed from his firearms expert the true condition of the firearm used in the shooting. |
| 1(c). | His trial counsel failed to call Helen Holt and Clay Nealy as witnesses. |
| 1(d). | His trial counsel failed to interview and present testimony from Tiffany Probst, Dwaine Dennie, Teresa Dominguez, and Michael Ruiz. |
| 1(e). | His trial counsel failed to present the 911 tapes and transcript. |
| 1(f). | His trial counsel failed to present a blood spatter expert. |
| 1(g). | His trial counsel failed to interview and present character witnesses. |
| 1(h). | His appellate counsel failed to raise the issue of spectators wearing buttons depicting the victim at trial. |
| 1(i). | His appellate counsel failed to raise the issues of prosecutorial misconduct and change of venue. |
| 2. | The state district court failed to allow him to present his theory of the case and used improper jury instructions. |
| 3. | The state district court improperly admitted prior bad act evidence. |
| 4. | The state district court improperly limited Lawrence Casias's testimony. |
| 5. | The state district court improperly permitted spectators to wear buttons with the victim on them. |
| 7. | The state district court failed to grant a change of venue and implement procedures to ensure a fair trial. |
| 8. | There were cumulative errors. |

1  (ECF No. 31.)

2  **II.    STANDARD OF REVIEW**

3         28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas

4  corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application
>     of, clearly established Federal law, as determined by the Supreme Court of the
>     United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts
>     in light of the evidence presented in the State court proceeding.

11  A state court decision is contrary to clearly established Supreme Court precedent, within the

12  meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law

13  set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

14  materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538

15  U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v.*

16  *Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly

17  established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state

18  court identifies the correct governing legal principle from [the Supreme] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*,

20  529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be

21  more than incorrect or erroneous. The state court's application of clearly established law must be

22  objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

23

1    The Supreme Court has instructed that "[a] state court's determination that a claim lacks
2    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the
3    correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing
4    *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a
5    strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*
6    at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)
7    (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating
8    state-court rulings, which demands that state-court decisions be given the benefit of the doubt"
9    (internal quotation marks and citations omitted)).

10   **III.    DISCUSSION**

11       **A.      Ground 1**

12       In Ground 1, Brown alleges numerous claims of ineffectiveness of his trial counsel. (ECF
13   No. 31 at 17-29.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of
14   claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the
15   attorney's "representation fell below an objective standard of reasonableness," and (2) that the
16   attorney's deficient performance prejudiced the defendant such that "there is a reasonable
17   probability that, but for counsel's unprofessional errors, the result of the proceeding would have
18   been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a
19   claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct
20   falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's
21   burden is to show "that counsel made errors so serious that counsel was not functioning as the
22   'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish
23   prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had

1  some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be

2  "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

3  When the ineffective assistance of counsel claim is based on appellate counsel's actions, a

4  petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues

5  and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable

6  failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*,

7  528 U.S. 259, 285 (2000).

8  Where a state district court previously adjudicated the claim of ineffective assistance of

9  counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.

10  *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court clarified that

11  *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is

12  doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal

13  quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination

14  under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme

15  Court's description of the standard as doubly deferential."). The Supreme Court further clarified

16  that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.

17  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s

18  deferential standard." *Harrington*, 562 U.S. at 105.

19      **1.    Ground 1(a)**

20  In Ground 1(a), Brown alleges that his trial counsel failed to interview, investigate, or call

21  Donna Lang as a witness. (ECF No. 31 at 18.) Brown elaborates that Lang would have

22  corroborated several essential elements of his defense. (*Id.*) In affirming the denial of Brown's

23  first state habeas petition, the Nevada Supreme Court held:

[A]ppellant argues that his trial counsel was ineffective for failing to present testimony from D.L. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. At the evidentiary hearing, counsel testified that he did not call D.L. as a witness because D.L. had given inconsistent stories, telling the police she was not at the scene of the shooting, but writing to appellant that she was present. Counsel also testified that he was concerned that D.L. would testify about a sexual relationship with appellant and about appellant's drug use. In addition, counsel testified that in his opinion, the jury would not find D.L. credible because she had a felony conviction for prostitution while knowing she was HIV positive. Based on those reasons, counsel testified that he made a tactical decision not to call D.L. as a defense witness. "Tactical decisions [of counsel] are virtually unchallengeable absent extraordinary circumstances." *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989). The district court concluded that counsel was not ineffective for failing to present D.L.'s testimony and substantial evidence supports that decision. Therefore, the district court did not err in denying this claim.

(ECF No. 19-1 at 66.) The Nevada Supreme Court's rejection of Brown's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Lang was interviewed by law enforcement the day of the shooting. (*See* ECF No. 47-27 at 23.) Lang reported that she had been living with Brown and Hanson for about a week prior to the shooting and that she "slept in the same bedroom" as Brown and Hanson. (*Id.* at 24.) Lang described Brown and Hanson's relationship as rocky, explaining that they would argue a lot. (*Id.* at 25.) Hanson had left Brown's apartment a few days before the shooting to stay with her father, but she returned to the apartment on Friday, September 7, 2001, in the evening. (*Id.* at 26.) Brown and Hanson immediately started arguing, and Hanson eventually left the apartment around 1:00 a.m. or 1:30 a.m. on Saturday, September 8, 2001. (*Id.* at 28, 30.) Brown left shortly after to look for Hanson. (*Id.* at 31.) Lang volunteered to go to Tiffany Probst's house to look for Hanson there, but before Lang arrived, Hanson called her. (*Id.* at 31-32.) Hanson told Lang that she was near Brown's apartment again and not to tell Brown. (*Id.* at 32.) Lang told Hanson to meet her at

Probst's house, but "obviously she [went] back to [Brown]'s apartment." (*Id.* at 33.) Law enforcement then asked Lang if "there [was] anything else that [she] could add to [her] statement that [she] feel[s] is important." (*Id.* at 34.) Lang responded, "they told me last night that, that, um, he said the gun accidentally went off. I wonder will that, is that true?" (*Id.* at 34.) Lang then explained that Brown's gun had "accidentally went off" before "whatever night it was that they were with the Mexicans and he shot the wall." (*Id.* at 35.)

Lang was arrested shortly after the shooting on unrelated charges and wrote several letters while incarcerated. (*See* ECF No. 47-12 at 11-17.) In one letter, dated November 19, 2001, Lang wrote, "I was there that night." (*Id.* at 11.) In another letter, dated August 30, 2002, Lang wrote, Probst "has the D.A. thinking that I was in the apartment when [Hanson] got shot. She seems to just be making things up. She knows I wasn't there." (*Id.* at 13.) And in an undated later, Lang wrote, "I am worried about the case I was subpoena in. The D.A. thinks it was planned, but I know it was an accident. I may be the only one that can prove it." (*Id.* at 16.) Finally, in another undated letter, Lang wrote, "I lived at 451 N. Nellis with my girlfriend. Her baby's father killed her three days before I was arrested. I was there when it happened." (*Id.* at 15.)

Brown testified at his post-conviction evidentiary hearing that he told his trial counsel about Lang and "[r]epeatedly" demanded that she be called as a witness because "[s]he was there when everything . . . happened" and could "explain . . . what [Hanson] was doing at [his] house." (ECF No. 48-5 at 5, 7-8.) Brown referenced Lang's letters as proof that she would have been an exculpatory witness, explaining that Lang said "[s]he knew it was an accident" because she "was there when it happened." (*Id.* at 9.) Brown believed that his trial counsel interviewed Lang, and, in fact, Brown decided not to testify at his trial because his trial counsel "said everything he needed from [Brown] he could get from Donna Lang." (*Id.* at 6.)

8

Mary Louise Brown (hereinafter "Mary"), Brown's mother, testified at the post-conviction evidentiary hearing that she saw Lang "coming down the stairs" outside of Brown's apartment after the shooting took place. (ECF No. 48-5 at 10.) Lang later told Mary that the shooting was an accident and that "she was there in the house." (*Id.* at 11.) Mary told Brown's trial counsel this information, but "[h]e first said that he didn't think he could use her as a witness, because Donna was changing her statements and it might have an affect [sic] on [Brown] because he found out that Donna was a lady - - a man." (*Id.* at 10.) Avianne Davis, Brown's niece, also testified at the post-conviction evidentiary hearing that she passed Lang on the stairs on her way into Brown's apartment after the shooting took place. (*Id.* at 12.) Davis believed she also told Brown's trial counsel this information. (*Id.*)

Brown's trial counsel testified at the post-conviction evidentiary hearing that he did not remember whether he had any personal conversations with Lang, and when asked if he had an investigator speak with Lang, Brown's trial counsel responded, "I didn't recall that, but something you've just given me mak[es] me believe that I did." (ECF No. 48-5 at 14.) Brown trial counsel reviewed Lang's voluntary statement and her letters prior to trial. (*Id.* at 14, 17.) He then discussed Lang's potential testimony with Brown, and "Brown was adamant that he wanted . . . Lang called as a witness and believed that Lang may have been in the apartment when the shooting took place." (*Id.* at 14.) However, Brown and Lawrence Casias, who was present in the front of the apartment when the shooting took place, never mentioned that they saw Lang at the apartment during the shooting, and Brown's trial counsel did not believe Lang would have testified that she was at the apartment during the shooting because his investigator "had talked to Donna Lang at some point," which Brown's trial counsel "didn't realize until [he] saw [a] memo." (*Id.* at 16-17.)

1    Brown's trial counsel also testified to several strategic reasons why he did not call Lang to

2    testify. (ECF No. 48-5 at 18-20.) First, he believed that Lang would be subject to impeachment

3    because her letters indicated that she was in the apartment at the time of the shooting, but her

4    voluntary statement questioned whether the shooting was an accident. (*Id.* at 18-19.) Second,

5    Brown's trial counsel was concerned with how the jury would perceive Lang for a variety of

6    reasons: she "was pre-op transsexual," she had been convicted of "soliciting for prostitution

7    knowing [she was] HIV positive," she "had indicated that she was sharing a bed with [Brown] and

8    with [Hanson]," and she was a drug user. (*Id.*) Third, Brown's trial counsel believed some of

9    Lang's testimony could have been detrimental to Brown. Specifically, he was concerned that Lang

10   may have testified that "the relationship between [Brown] and [Hanson w]as rocky," that Brown

11   and Hanson "would argue a lot," that Brown and Hanson "were arguing on the evening of the

12   murder," and that Brown "was on a rampage . . . after [Hanson] left the apartment" the night of

13   the shooting. (*Id.* at 20.)

14   The head prosecutor from Brown's trial testified at the post-conviction evidentiary hearing

15   that he interviewed Lang prior to the trial. (ECF No. 48-5 at 24-25.) Lang told him that Brown and

16   Hanson had a flight on the night of the shooting because Brown "was selling drugs to . . . two

17   girls." (*Id.* at 25.) Lang indicated "that [Hanson] was planning on leaving and going to Chicago

18   and taking the little girl by the name of Serenity, and that [Brown] knew about this and was upset

19   about that, didn't want her to leave with this little baby." (*Id.*) Further, Lang explained that Brown

20   and Hanson "were fighting so much and he had made comments that he was going to kill her. That

21   they could not be separated without one of them dying." (*Id.* a 26.) Lang stated that she was not

22   present at the time of the shooting, but "[s]he indicated that she went over to the apartment and

23   when she got there[,] she ran up the stairs . . . [and] saw a lot of blood." (*Id.* at 25-26.)

Like Brown's trial counsel, the head prosecutor was concerned with how Lang would be perceived by the jury, explaining that he joked and laughed about Lang's appearance with an associate and believed the jury's response to Lang would have been similar. (ECF No. 48-5 at 26.) Therefore, the head prosecutor determined that he would "have a better shot at it at cross-examination rather than putting [Lang] up and trying to create the credibility as a State's witness." (*Id.* at 26-27.) The head prosecutor also noted Lang's inconsistencies about her presence at the apartment at the time of the shooting. (*Id.* at 28.)

Because Brown's trial counsel did not remember whether he had personally interviewed Lang and was relatively unsure of whether his investigator interviewed Lang[1] (*see* ECF No. 48-5 at 14, 17), this court tends to give his decision not to call Lang as a witness less deference. *See Lord v. Wood*, 184 F.3d 1083, 1095 n.8 (9th Cir. 1999) ("Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively. However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness. The reason for this is simple: A lawyer who interviews the witness can rely on his assessment of their articulateness and demeanor-factors we are not in a position to second-guess." (Internal citation omitted)). However, after reviewing the record with less deference to Brown's trial counsel's actions, this court concludes that the Nevada Supreme Court reasonably determined that Brown fails to demonstrate that his trial counsel acted deficiently in refusing to call Lang as a witness. *Strickland*, 466 U.S. at 688.

First, as was reasonably noted by the Nevada Supreme Court, Brown's trial counsel reviewed Lang's voluntary statement—where Lang did not mention that she was present at the

---

[1] An internal memorandum from the public defender's office dated September 20, 2001, indicated that "Mr. Lang was interviewed by officers." (ECF No. 47-27 at 15.) It is unclear which officers—law enforcement officers or public defender officers—interviewed Lang.

1   time of the shooting and questioned whether the shooting was accidental (*see* ECF No. 47-27 at

2   34)—and her letters—which were inconsistent regarding Lang's presence at the time of the

3   shooting (*see* ECF No. 47-12 at 11-17)—and reasonably determined that Lang could be impeached

4   based on her inconsistent statements. (ECF No. 48-5 at 18-19.) Second, again as was reasonably

5   noted by the Nevada Supreme Court, Brown's trial counsel reasonably determined that the jury

6   may not perceive Lang in the best light given her prior convictions (*see* ECF No. 47-27 at 40

7   (showing her convictions for engaging in or soliciting prostitution while diagnosed with AIDS)),

8   her relationship with Brown and Hanson (*see id.* at 25 (Lang's voluntary statement that she slept

9   in the same bed as Brown and Hanson)), and her lifestyle (*see* ECF No. 48-5 at 18-19 (testimony

10  that Lang was a drug user and "pre-op transsexual")). Third, Brown's trial counsel reasonably

11  determined that portions of Lang's potential testimony may be detrimental to Brown's defense.

12  (*See* ECF No. 47-27 at 25, 31, 34 (Lang's voluntary statement that Brown and Hanson argued a

13  lot, that Brown "was just on a rampage" looking for Hanson the night of the shooting, and that

14  Brown's friends "stayed clear of [Brown and his attempts to locate Hanson on the night of the

15  shooting] 'cause [Brown] was being mean to [Hanson]")). Accordingly, because the Nevada

16  Supreme Court reasonably denied Brown's ineffective-assistance-of-trial-counsel claim, Brown is

17  denied federal habeas relief for Ground 1.

18       Before moving to Ground 2, this court notes that Brown has urged this court to consider a

19  declaration made by Lang on December 2, 2011, nearly eight months after the Nevada Supreme

20  Court affirmed the denial of Brown's state habeas petition on April 28, 2011. (*See* ECF Nos. 32-

21  1, 49-25). Generally, this court is precluded from considering any evidence that was not before the

22  Nevada Supreme Court at the time it considered Brown's appeal of the denial of his state habeas

23  petition. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under §

2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Brown attempts to avoid this preclusion by arguing that the state district court's fact-finding process was deficient. (*See* ECF No. 112 at 28 (citing *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012) ("In some limited circumstances, we have held that the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2).")))).

The "ultimate issue" in resolving this dispute "is whether the state's fact-finding procedures were reasonable." *Hibbler*, 693 F.3d at 1147 (explaining that "this is a fact-bound and case-specific inquiry"). Here, the state district court held an extensive post-conviction evidentiary hearing on this claim and heard the testimony of five witnesses. (*See* ECF No. 48-5.) It is true that the state district court denied a request for a continuance of the post-conviction evidentiary hearing so that Lang could be located. (*Id.* at 24, 30.) Indeed, Brown's post-conviction counsel explained that he had been trying unsuccessfully to locate Lang for quite some time. (*Id.* at 4 (explaining that his "investigator had a list of about 5000 names Donna Lang (sic). She was going through each one of them trying to find this person").) However, because the state district court reviewed Lang's voluntary statement, reviewed Lang's pre-trial letters, and heard the head prosecutor's testimony about his pre-trial interview with Lang, it cannot be concluded that the state district court's fact-finding procedures were unreasonable. As such, this court does not consider Lang's December 2, 2011, declaration in its assessment of Ground 1.[2]

---

[2] Alternatively, even under a *de novo* review, consideration of Lang's December 2, 2011, declaration would not alter this court's conclusion that Brown is not entitled to federal habeas relief on Ground 1. In her declaration, Lang stated, in pertinent part, that "it was not uncommon for [Hanson to] sneak in and out of [Brown's] apartment when she was wanted something," Lang "had personally seen [Hanson] enter [Brown]'s apartment though the window several times and knew this was her plan on the evening she was killed," and Lang found Hanson "clearly dead" in Brown's apartment before law enforcement arrived. (ECF No. 32-1 at 2-3.) Lang also declared:

## 2.    Ground 1(b)

In Ground 1(b), Brown alleges that his trial counsel concealed the true condition of the firearm used in the shooting from his firearms expert, failed to provide that expert all the stock, and failed to conduct the most basic inquiry of that expert that would have led to highly exculpatory evidence. (ECF No. 31 at 21.) In support of his allegation, Brown explains that his trial counsel failed to notify his expert that the shotgun's stock was so ill-fitting that it fell off when the shotgun was dropped after the shooting. (*Id.*)

This court previously determined that this ground was unexhausted. (*See* ECF No. 59 at 5-6.) After obtaining a stay from this court, Brown returned to state court, where the Nevada Supreme Court determined that this ground was procedurally barred as untimely under Nev. Rev. Stat. § 34.726(1) and as successive under Nev. Rev. Stat. § 34.810(2). (ECF No. 71-16.) After reopening the instant case, Brown then argued before this court that he had good cause to excuse the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012) based on his post-conviction

---

[Brown] wouldn't have known [Hanson] was in the apartment, or expected her to be there when he shot her. I spoke with [Brown] as I was headed from Tiffany's house to his apartment; I remember knowing he was not home at the time. I remember [Hanson] and I had to plot out a kind of "cloak and dagger" operation to make sure [Brown] wouldn't walk in on [Hanson] getting drugs from his apartment. [Hanson] and I were definitely avoiding [Brown] that night; we would have tried to ensure he was not home when [Hanson] snuck in. If keeping [Brown] away from [Hanson] and the apartment meant that I had to misdirect him as to our whereabouts, I would have done so, though not with malicious intent. [Hanson] and I played similar cat and mouse games with [Brown] before, when we wanted to hang out or do something without his knowing and without guys around.

(*Id.* at 3.) While this testimony may not have been duplicative of other trial testimony, this court cannot conclude that (1) Brown's trial counsel was deficient for not calling Lang as a witness in order to present this information, or (2) that this testimony would have changed the result of Brown's trial. *Strickland*, 466 U.S. at 688, 694. Indeed, Brown's trial counsel still had reasonable concerns regarding how the jury would perceive Lang and about her detrimental testimony regarding Brown and Hanson's tumultuous relationship.

counsel's ineffectiveness. (ECF No. 84 at 2-4.) This court deferred consideration of Brown's cause and prejudice argument under *Martinez* until the time of merits consideration. (ECF No. 89 at 4.)

In *Martinez*, the Supreme Court ruled that "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim" if "the state courts did not appoint counsel in the initial-review collateral proceeding" or "where appointed counsel in the initial-review collateral proceeding . . . was ineffective." 566 U.S. at 14. "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* This court will first address whether Brown's claim has merit.

The State called expert witness James Krylo, a firearms examiner working at the Las Vegas Metropolitan Police Department, during Brown's trial. (ECF No. 43-37 at 34-35.) Krylo examined the "12 Gauge Pump Shotgun" that killed Hanson in order to compare "some fired components of ammunition," to determine "if it could go off accidentally," and "to do testing for distance determination." (*Id.* at 36-37.) Krylo explained that the shotgun had "no stop on it," that he "receive[d] in a separate package just a pistol grip for it," that "the barrel had been cut off," and that there was no stock. (*Id.* at 50, 54.) Krylo "didn't encounter any malfunctions" with the shotgun and "actually dropped the shotgun onto a hard rubber mat in six different configurations . . . to see if . . . it would fire accidentally." (*Id.* at 39-40.) "The shotgun did not fire when [Krylo] did [this] testing." (*Id.* at 40.) Instead, "[t]he only way [Krylo] could get the gun to go off [was] to pull the trigger." (*Id.* at 41.) Krylo also determined that the shotgun required "between five and five and one quarter pounds" of applied weight on the trigger to cause the shotgun to fire and that "the shot [in question] was fired from a distance greater than two feet but less than six feet." (*Id.* at 41, 48.)

During cross-examination, Krylo explained that the shotgun was missing a stock bolt and that "the only thing that was holding [the stock and barrel together] was probably just a friction fit . . . or the tape." (*Id.* at 54.) Krylo then explained that because the stock bolt was missing, he "didn't want to fire the gun for safety and comfort reasons simply with a stock." (*Id.* at 54-55.) Krylo added that he "didn't do any test with the gun to see what had happened if you are holding it with [the] loose stock." (*Id.* at 56.) Krylo then testified that the only test he conducted to determine whether an accidental discharge occurred—*i.e.*, a mechanical malfunction—was dropping the weapon to see if it would fire. (*Id.* at 55-56.) This accidental discharge calculation did not consider the shooter's intent, whether the shotgun was intentionally fired or not, or human error. (*Id.* at 56-57.) And, as such, Krylo testified that he did not "know whether human error was involved or not in this case." (ECF No. 43-38 at 15.) When he was asked whether "mishandling the weapon [or] being startled . . . could cause [someone] to pull [the] trigger on a working gun," Krylo responded, "I would certainly expect it could." (*Id.* at 2.) And in relation to this answer, Krylo answered in the affirmative when asked if "[e]ven [law enforcement] has inadvertent shootings with working weapons" and when asked if the shotgun in question was "capable of being inadvertently fired." (*Id.* at 11, 15.)

Following the state district court's denial of Brown's state habeas petition and briefing on Brown's appeal of that denial before the Nevada Supreme Court, Brown obtained a declaration by Robert Irwin dated December 24, 2010. (*See* ECF Nos. 49-25 at 7, 49-20 at 3.) Brown's trial counsel noticed Robert Irwin as an expert witness prior to trial, explaining that Irwin would "testify regarding the firearms analysis he performed in this case." (ECF No. 43-7 at 2.) However, Brown's trial counsel never called Irwin to testify.

In that declaration, Irwin, a firearms expert, stated that he was contacted by and had communications with Brown's trial counsel prior to Brown's trial. (ECF No. 49-20 at 31.) Brown's trial counsel provided Irwin "a shotgun for [him] to examine at his offices in order to determine if it was in working order and if any mechanical problems would cause a discharge." (*Id.*) The shotgun that Brown's trial counsel provided Irwin had no stock, and Irwin "was never informed that the shotgun [he] examined ever had a stock, that any stock was in evidence in the case, or that the shotgun was purportedly fired during the crime at issue in the case with a loose-fitting or improperly mounted stock." (*Id.*) Brown's trial counsel "never requested [Irwin's] opinion as to the effect that a loosely-fitting or improperly mounted stock would have on the use or functioning of the weapon," and Irwin "was never asked or permitted to perform any tests on the weapon beyond shaking and bumping it to see if this would release the hammer." (*Id.*) Importantly, Irwin reported that "[h]ad [Brown's trial counsel] informed [him] that the weapon was purportedly fired with a loose-fitting or improperly mounted stock, [he] would have informed him and testified to the fact that that there would be a high likelihood for the shotgun to be fired accidentally." (*Id.*) Irwin elaborated: "[i]f the loose stock moved or was bumped while the shooter's finger was on the trigger, that could cause accidental firing" and "the likelihood of an accidental firing of such a weapon would increase even more in close quarters and/or in a stressful or life-threatening situation." (*Id.*) Finally, Irwin reported that "[h]ad [he] been asked, [he] also would have informed [Brown's trial counsel] that the likelihood of that shotgun with a loosely-fitting or poorly mounted stock discharging accidentally was even higher than in the case of the shotgun with no stock at all." (*Id.* at 31-32.)

Although Brown's trial counsel consulted with Irwin regarding the mechanical function of the shotgun, he did not inform Irwin about the fact "that the shotgun was purportedly fired during

1   the crime at issue in the case with a loose-fitting or improperly mounted stock." (ECF No. 49-20

2   at 31.) And there was no stock provided with the shotgun at the time of Irwin's examination for

3   him to have surmised that information independently. (*Id.*) This amounted to a deficiency on the

4   part of Brown's trial counsel, as it was unreasonable not to investigate whether the improperly-

5   mounted stock played a role in Brown's alleged inadvertent discharge of the shotgun—his primary

6   defense. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations

7   or make a reasonable decision that makes particular investigations unnecessary."); *see also Caro*

8   *v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) ("Once [a] determination has been made [that

9   an expert needs to be consulted], counsel must present those experts with information relevant to

10   the conclusion of the expert.").

11        Turning to prejudice, Irwin's testimony that "there would be a high likelihood for [a]

12   shotgun [with a loose-fitting or improperly mounted stock] to be fired accidentally," especially in

13   close quarters or a stressful situation, certainly would have been beneficial to Brown's defense.

14   (ECF No. 49-20 at 31.) However, this testimony would have only established a theoretical

15   possibility that that the shotgun was fired inadvertently. And more importantly, Brown's trial

16   counsel extracted concessions along these lines from Krylo. For example, Krylo testified that it

17   was not safe for him to fire the shotgun with the loose-fitting stock, *i.e.*, without the stock bolt;

18   that he could not determine whether Brown had fired the shotgun intentionally or due to human

19   error; and that he would "certainly expect" that someone could pull the trigger on a firearm due to

20   being startled. (ECF No. 43-37 at 54-57; ECF No. 43-38 at 2.) As such, although it is conceivable,

21   this court cannot conclude that there is a reasonable probability that the result of Brown's trial

22   would have been different had his trial counsel informed Irwin about the stock issue and presented

23   Irwin's testimony at Brown's trial. *Strickland*, 466 U.S. at 693-94. Because Brown fails to

1   demonstrate prejudice regarding his trial counsel's deficiency, Ground 1(b) is not substantial and

2   is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

3           **3.    Grounds 1(c) and 1(d)**

4           In Ground 1(c), Brown alleges that his trial counsel failed to call Helen Holt and Clay

5   Nealy as witnesses to testify about his demeanor immediately after the shooting and about the fact

6   that Brown asked them to call 911 on his behalf. (ECF No. 31 at 25.) Brown explains that he called

7   Nealy's home following the shooting and that Holt, Nealy's girlfriend, called 911 at his request.

8   (*Id.*) And in Ground 1(d), Brown alleges that his trial counsel failed to interview and present

9   testimony from Tiffany Probst, Dwaine Dennie, Teresa Dominguez, and Michael Ruiz. (*Id.*)

10  Brown elaborates that Probst could have confirmed Lang's rendition of events on the night of the

11  shooting, Dennie could have provided testimony about the letters he received from Lang that

12  provided that the shooting had been an accident, and Dominguez and Ruiz could have testified that

13  they heard the gunshot and believed the shooting was an accident. (*Id.* at 25-26.) In affirming the

14  denial of Brown's first state habeas petition, the Nevada Supreme Court held:

15          [A]ppellant argues that trial counsel was ineffective for failing to investigate and
            call multiple witnesses to testify. Appellant fails to demonstrate that he was
16          prejudiced. For the majority of the witnesses appellant lists, appellant asserts that
            they would have provided information supporting D.L.'s testimony. As counsel
17          testified at the evidentiary hearing that he made a tactical decision to not call D.L.
            to testify, appellant fails to demonstrate a reasonable probability that investigation
18          into witnesses to bolster D.L.'s testimony would have changed the outcome of trial.
            Further, given the strength of the evidence of appellant's guilt, he fails to
19          demonstrate that the witnesses that allegedly supported D.L. had a reasonable
            probability of changing the outcome had they testified at trial.
20
            For the additional witnesses appellant lists, he asserts they would have offered
21          further testimony concerning appellant's claim that the shooting was accidental.
            These witnesses would have been duplicative of witnesses who testified at trial and,
22          given the strength of the evidence of appellant's guilt, appellant fails to demonstrate
            a reasonable probability of a different outcome had these witnesses been called to
23          testify. Therefore, the district court did not err in denying this claim without
            considering it at an evidentiary hearing.

(ECF No. 19-1 at 67-68.) The Nevada Supreme Court's rejection of Brown's claims was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Turning first to Holt and Nealy, the Nevada Supreme Court reasonably concluded that Brown failed to demonstrate prejudice. *Strickland*, 466 U.S. at 694. As the Nevada Supreme Court reasonably noted, Holt and Nealy's testimony about Brown's demeanor following the shooting and his request for someone to call 911 was duplicative of other witnesses. First, Casias, whose testimony is further discussed in Ground 4, testified that Brown was in shock after the shooting, that "[h]e looked scared," that he was "tripping out" and in a fog, and that he appeared extremely concerned. (ECF No. 7-3 at 23, 27-28.) Second, Douglas Cansler testified that Brown came to his apartment immediately after the shooting and described Brown as looking scared, nervous, very upset, and wet from sweat or possibly tears. (ECF No. 7-4 at 17, 21, 29-30, 86.) Brown told Cansler to "call the ambulance, call the police, call [his] mother." (*Id.* at 30.) Third, Kristie Williams, Cansler's girlfriend, also saw Brown immediately after the shooting and described him as being nervous, sweating, crying, and pacing around. (ECF Nos. 7-4 at 86; 7-5 at 10, 19-20, 25.) Fourth, Officer Marla Clayton testified that Brown "was soaking wet," "very nervous," and shaking following the shooting. (ECF No. 7-5 at 35, 44, 49.) Finally, Officer Brian Hibbetts testified that Brown was upset after the shooting. (ECF Nos. 7-5 at 53; 8-1 at 4, 8.) Thus, based on the duplicative nature of Holt and Nealy's testimonies with the testimonies of Casias, Cansler, Williams, Officer Clayton, and Officer Hibbetts regarding Brown's demeanor and with Cansler's

testimony regarding Brown's request that 911 be called, it cannot be concluded that Holt and Nealy's testimonies would have resulted in a different outcome at trial.[3]

Turning next to Probst and Dennie, the Nevada Supreme Court again reasonably determined that Brown failed to demonstrate prejudice. *Strickland*, 466 U.S. at 694. As the Nevada Supreme Court reasonably noted, Brown desired to have Probst and Dennie testify regarding Lang. However, because Brown's trial counsel testified at the post-conviction evidentiary hearing that he strategically chose not to call Lang as a witness (ECF No. 48-5 at 18-20), which this court addressed in Ground 1(a), Brown fails to demonstrate that his trial counsel should have investigated possible supporting testimony from Probst and Dennie.

Turning finally to Dominguez and Ruiz, law enforcement took both of their voluntary statements following the shooting. (ECF No. 47-12 at 22-23.) Dominguez wrote that she "was laying in bed with [Ruiz] and [they] both heard a shot go off. A few minutes went by and then [she] heard 2 guys running and one said oh dog." (*Id.* at 22.) Dominguez told Ruiz that "someone got shot either by accident or they shot someone [because] the person that said oh dog sounded like there was something very wrong." (*Id.*) Ruiz wrote that he also "heard one gun shot," and "[a]t that point [he] heard 1 male say to possibly another aw dawg." (*Id.* at 23.) Again, the Nevada Supreme Court reasonably concluded that Brown failed to demonstrate prejudice. *Strickland*, 466 U.S. at 694. It cannot be concluded that Dominguez and Ruiz's cumulative testimonies that they heard a gunshot, someone say "oh dog" in an apparent worried tone, and then two men running

---

[3] Brown has urged this court to consider a declaration made by Nealy on February 17, 2012, nearly ten months after the Nevada Supreme Court affirmed the denial of Brown's state habeas petition on April 28, 2011. (*See* ECF Nos. 32-3, 49-25.) As this court explained in Ground 1(a), this court is precluded from considering any evidence that was not before the Nevada Supreme Court at the time it considered Brown's appeal of the denial of his state habeas petition. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

1  away would have resulted in a different outcome at trial, especially since there was no dispute

2  about the gunshot and Brown and Casias running away thereafter.

3      Because the Nevada Supreme Court reasonably denied these claims regarding Holt, Nealy,

4  Probst, Dennie, Dominguez, and Ruiz, Brown is denied federal habeas relief for Grounds 1(c) and

5  1(d).

6              **4.      Ground 1(e)**

7      In Ground 1(e), Brown alleges that his trial counsel failed to present the tapes and transcript

8  of Holt's 911 call. (ECF No. 31 at 26.) In affirming the denial of Brown's first state habeas petition,

9  the Nevada Supreme Court held:

10         [A]ppellant argues that trial counsel was ineffective for failing to present a tape of
           a 911 call made after the shooting by a person named Helen. Appellant fails to
11         demonstrate that he was prejudiced. Appellant asserts that this 911 call would have
           bolstered his accidental shooting defense because Helen told the 911 dispatcher that
12         appellant stated he accidentally shot the victim. During trial, multiple witnesses
           testified that appellant told them the shooting was an accident. The information
13         from this 911 call would have been duplicative of that testimony. Given the
           evidence presented at trial, appellant fails to demonstrate a reasonable probability
14         of a different outcome had this 911 tape been presented at trial. Therefore, the
           district court did not err in denying this claim without considering it at an
15         evidentiary hearing.

16  (ECF No. 19-1 at 69.) The Nevada Supreme Court's rejection of Brown's claim was neither

17  contrary to nor an unreasonable application of clearly established law as determined by the United

18  States Supreme Court and was not based on an unreasonable determination of the facts.

19      Holt called 911 following the shooting and informed the dispatcher that she had received

20  "a phone call from a friend . . . , his name is [Brown]. He said . . . , 'Helen call the police, I

21  accidentally shot [Hanson].'" (ECF No. 47-12 at 25.) The Nevada Supreme Court reasonably

22  concluded that Brown failed to demonstrate prejudice regarding his trial counsel's failure to play

23  this recording. *Strickland*, 466 U.S. at 694. As the Nevada Supreme Court reasonably noted, Holt's

911 call stating that Brown told her that he accidentally shot Hanson was duplicative of other testimony. For example, Officer Clayton testified that Brown "kept saying, it was an accident, it was an accident." (ECF No. 7-5 at 49.) Officer Hibbetts testified that the "feeling that [he] got from what [Brown] was saying that it was an accidental discharge." (ECF No. 8-1 at 6.) And Guy Powell, who was in a brief relationship with Hanson, testified that Brown "told [him] that [the shooting of Hanson] was an accident." (ECF No. 6-3 at 10-11, 13.) Therefore, based on the duplicative nature of the foregoing testimony with Holt's 911 call in which Holt stated that Brown told her that the shooting was an accident, it cannot be concluded that playing Holt's 911 call for the jury would have resulted in a different outcome at trial. Because the Nevada Supreme Court reasonably denied this claim, Brown is denied federal habeas relief for Ground 1(e).

### 5.    Ground 1(f)

In Ground 1(f), Brown alleges that his trial counsel failed to present a blood spatter expert, Charles V. Morton, who could have testified that the blood patterns at the scene were consistent with an accidental discharge of the shotgun. (ECF No. 31 at 27.) In affirming the denial of Brown's first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that trial counsel was ineffective for failing to present testimony from a . . . blood spatter expert. Appellant fails to demonstrate that he was prejudiced. Appellant names two expert witnesses whom counsel should have called, but fails to provide any reports or statements from those witnesses which would indicate that these experts would have testified in a different manner than the expert witnesses the State called to testify. Thus, appellant fails to demonstrate a reasonable probability of a different outcome had the experts he names been called to testify. Therefore, the district court did not err in denying this claim without considering it at an evidentiary hearing.

(ECF No. 19-1 at 69-70.) The Nevada Supreme Court's rejection of Brown's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Charles V. Morton was listed on Brown's notice of expert witnesses prior to trial. (*See* ECF No. 47-12 at 31.) The notice stated that "Morton is an expert in the area of blood splatter and will give scientific opinions related thereto. He will testify regarding the blood splatter analysis he performed in this case." (*Id.*) Morton was not called to testify at Brown's trial.

In his pro se state habeas petition, Brown explained that "had counsel called upon Mr. Morton to give his expert opinion on the blood splatter evidence, there stands a reasonable probability that he would [have] testified that blood splatter, in connection with the intense and overbearing circumstances experienced by Mr. Brown, were consistent with an accidental shooting." (ECF No. 47-11 at 39.) In a hearing held before the state district court on Brown's state habeas petition, Brown's post-conviction counsel explained that Brown's trial counsel hired Morton, and Morton was "prepared to go forward." (ECF No. 47-29 at 7.) Brown's post-conviction counsel requested an evidentiary hearing, in part, to find out "why it is that the experts were not called" at Brown's trial. (*Id.*) The state district court granted the request for a post-conviction evidentiary hearing, but it concluded that it would be "limited" and that its "main concern is just with regard to [Brown's trial counsel]'s tactical decisions regarding Donna Lang." (*Id.* at 22, 25.)

The Nevada Supreme Court reasonably determined that Brown failed to demonstrate prejudice. *Strickland*, 466 U.S. at 694. As the Nevada Supreme Court reasonably noted, Brown failed to support his claim that Morton would have testified differently than the State's expert.[4] As

---

[4] Brown argues that this claim should be reviewed *de novo* and an evidentiary hearing should be held because this determination by the Nevada Supreme Court was based on an unreasonable determination of the facts. (ECF No. 112 at 52-54 (citing *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) and *Hurles v. Ryan*, 650 F.3d 1301, 1312 (9th Cir. 2011)).). Brown elaborates that the Nevada Supreme Court faulted him for failing to provide any reports from Morton, but this failure was due to the state district court's defective fact-finding process wherein it barred him from presenting Morton's testimony at the post-conviction evidentiary hearing. (*Id.*) Although the state district court limited Brown's post-conviction evidentiary hearing to a single issue, Lang's testimony, Brown was not prevented from otherwise developing evidence on Morton. Indeed,

such, because Brown is unable to demonstrate a reasonable probability of a different outcome at his trial had Morton testified, the Nevada Supreme Court reasonably denied this claim. Brown is denied federal habeas relief for Ground 1(f).

### 6.    Ground 1(g)

In Ground 1(g), Brown alleges that his trial counsel failed to interview and present character witnesses at trial. (ECF No. 31 at 27.) Specifically, Brown contends that his trial counsel should have interviewed and presented the testimonies of Mary Brown, Charles Brown, Brenda McAllister, and his employers and coworkers. (*Id.*) In affirming the denial of Brown's first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to present character witnesses on appellant's behalf at trial. Appellant fails to demonstrate that he was prejudiced. Given the evidence produced at trial, appellant fails to demonstrate a reasonable probability of a different outcome had testimony from character witnesses been presented at trial. Therefore, the district court did not err in denying this claim without considering it at an evidentiary hearing.

(ECF No. 19-1 at 70.) The Nevada Supreme Court's rejection of Brown's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

In its order affirming Brown's judgment of conviction, the Nevada Supreme Court stated that it agreed that "the state district court erred in admitting evidence that [Brown] has a temper, that he snaps when he gets angry, that he is extremely violent, that he is prone to violence, that he is a bad guy and that his relationship with Hanson was violent and argumentative." (ECF No. 45-

---

nothing prevented Brown from including a declaration from Morton as an exhibit in his state habeas briefings. Further, there was no indication that Morton would have testified favorably at the post-conviction evidentiary hearing; instead, Brown's post-conviction counsel only appeared to want to question Brown's trial counsel about refusing to call Morton. As such, it cannot be concluded that the state district court's fact-finding process was defective.

25

22 at 9-10.) Brown contends that his trial counsel should have presented the following testimony, which he outlined in his state habeas petition, to rebut the State's foregoing, unflattering character evidence:

> Mary Brown would have testified that she was practically a second mother to Rebekah Hanson and that over the 9 to 10 years of knowing Ms. Hanson, she had confided in Mrs. Brown on various matters. Mrs. Brown would have testified that she was aware of their off and on relationship and that their relationship, at times, was peppered with arguments and violence. In the times that Ms. Hanson did confide in Mrs. Brown regarding the relationship, Ms. Hanson often would state she was leaving Mr. Brown, but on most instances, would stay away for a few days and then return home.

> Mrs. Brown would have testified that in the few weeks prior to the accidental shooting, there was no sign of unrest or indifference between Mr. Brown and Ms. Hanson and no indication of her desire to leave with the child.

> Mrs. Brown would have testified to Mr. Brown being a hard-working man, a good father to his child, loyal son, and good-natured individual who truly loved Ms. Hanson.

> The character testimony of Mr. Brown, the father, and Brenda McAllister would have demonstrated that Mr. Brown was an overall loving and caring man to his family, child and Ms. Hanson.

> The personal interviewing of Mr. Brown's employer, Progressive Roofing, and his co-workers would have revealed viable character witnesses to demonstrate Mr. Brown was a good man who often spoke about his family and children.

(ECF No. 47-11 at 43-44.)

The Nevada Supreme Court reasonably concluded that Brown failed to demonstrate prejudice regarding his trial counsel's failure to present these character witnesses. *Strickland*, 466 U.S. at 694. Although this testimony may have benefited Brown by portraying him in a better light, it is mere speculation that this character evidence would have resulted in a different outcome at Brown's trial, especially since the jury may not have given much credence to character testimony from Brown's family and friends. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland*

1  prejudice is not established by mere speculation."). As such, because the Nevada Supreme Court

2  reasonably denied this claim, Brown is denied federal habeas relief for Ground 1(g).

3                    **7.      Ground 1(h)**

4          In Ground 1(h), Brown alleges that his appellate counsel failed to raise the issue of

5  spectators wearing buttons depicting the victim at trial. (ECF No. 31 at 28.) In affirming the denial

6  of Brown's first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that appellate counsel was ineffective for failing to argue that it
> was prejudicial for courtroom spectators to wear a button with a picture of the
> victim. Appellant fails to demonstrate he was prejudiced by counsel's omission of
> this issue. Given the strength of the evidence of appellant's guilt, appellant fails to
> demonstrate a reasonable likelihood of a different outcome on appeal had this issue
> been raised. Therefore, the district court did not err in denying this claim without
> considering it at an evidentiary hearing.

11 (ECF No. 19-1 at 71-72.) The Nevada Supreme Court's rejection of Brown's claim was neither

12 contrary to nor an unreasonable application of clearly established law as determined by the United

13 States Supreme Court and was not based on an unreasonable determination of the facts.

14         During the trial, Brown's trial counsel made a record that 15 to 18 spectators were "wearing

15 . . . pictures around their neck" of Hanson. (ECF No. 9-3 at 26.) The state district court commented,

16 "I think the jury understands that we have a lot of family members and they're on both sides and

17 they see it. And they also understand that there's a common child. . . . I'm not bothered by the

18 pictures." (*Id.* at 26.) A little bit later, the state district court also noted, "[t]he Court finds nothing

19 wrong with that at all. This is . . . a tragic case because this child has lost a mother and now stands

20 to lose a father; so, I mean, it's tragic, there's nothing else you can say about it." (*Id.* at 26-27.)

21 Later, during closing argument, Brown's trial counsel commented on the pictures: "[w]e've seen

22 people come in the courtroom. They've got necklaces around their neck. They've got pictures

23

1 around their neck. They're all grieving for someone that they've lost, we've seen it." (ECF No.

2 10-5 at 9.)

3       Brown's notice of appeal was filed on January 2, 2003, and his appellate counsel filed his

4 opening brief before the Nevada Supreme Court on August 4, 2003. (ECF No. 12-1 at 39.) At that

5 time, *Carey v. Musladin*, which held that "a state court['s holding] that buttons displaying the

6 victim's image worn by the victim's family during respondent's trial did not deny respondent his

7 right to a fair trial" was not "contrary to or an unreasonable application of clearly established

8 federal law," had not yet been decided. 549 U.S. 70, 72 (2006). However, even if Brown's

9 appellate counsel was deficient for not including a claim regarding the buttons in Brown's direct

10 appeal, the Nevada Supreme Court reasonably determined that Brown failed to demonstrate

11 prejudice given the strength of the evidence of Brown's guilt.[5] *Strickland*, 466 U.S. at 694; *Smith*,

12 528 U.S. at 285. In its order affirming Brown's judgment of conviction, the Nevada Supreme Court

13 "conclude[d] that overwhelming evidence support[ed] that this was a non-accidental shooting"

14 because:

15         several witnesses testified that Brown had beaten Hanson on multiple occasions
over a five-year period. Other witnesses testified to being attacked or threated by

16         Brown for either attempting to protect Hanson or having a relationship with
Hanson. Brown had previously threatened Hanson with a gun. Forensic experts

17         testified that Hanson's wounds could not have been caused by an accidental
discharge of the shotgun and that the shotgun did not malfunction or accidentally

18         discharge when tested. In addition, Brown told various people several different
versions of what happened. One version was that he shot Hanson accidentally

19         thinking she was an intruder, as opposed to accidentally discharging the shotgun.

20 (ECF No. 12-2 at 72.) As such, even if Brown's appellate counsel had included the button issue in

21 his direct appeal, Brown fails to demonstrate that he would have prevailed on appeal given that

22

23

    [5] Brown argues that this determination regarding the strength of the evidence was an unreasonable
determination of fact. (*See* ECF No. 112 at 62-63.) This argument lacks merit.

28

the Nevada Supreme Court determined on appeal that the evidence against Brown was strong.[6] Because the Nevada Supreme Court reasonably denied this claim, Brown is denied federal habeas relief for Ground 1(h).

### 8.     Ground 1(i)

In Ground 1(i), Brown alleges that his appellant counsel failed to raise two claims in his direct appeal: a prosecutorial misconduct claim regarding the State's threats towards Lang and a change of venue claim. (ECF No. 31 at 28-29.) In affirming the denial of Brown's first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that appellate counsel was ineffective for failing to argue that the State committed prosecutorial misconduct by intimidating D.L. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. As discussed previously, appellant fails to demonstrate that the State caused D.L. to feel threatened or compelled to change her testimony. Appellant fails to demonstrate that the underlying claim had a reasonable likelihood of success on appeal. Therefore, the district court did not err in denying this claim without considering it at an evidentiary hearing.
>
> [Next], appellant argues that appellate counsel was ineffective for failing to argue that the trial should have been moved to a different venue. Appellant fails to demonstrate that counsel's performance was deficient or that he was prejudiced. As discussed previously, appellant fails to demonstrate a reasonable likelihood that a fair and impartial trial could not be had in Clark County. Appellant fails to demonstrate that the underlying claim had a reasonable likelihood of success on appeal. Therefore, the district court did not err in denying this claim without considering it at an evidentiary hearing.

---

[6] Brown argues that the buttons were inherently prejudicial, so he satisfies the second *Strickland* prong. (*See* ECF No. 112 at 61.) However, the case relied upon by Brown, *Norris v. Risley*, provides that "[a] courtroom practice or arrangement is inherently prejudicial if 'an unacceptable risk is presented of impermissible factors coming into play.'" 918 F.2d 828, 830 (9th Cir. 1990), *abrogated by Carey v. Musladin*, 549 U.S. 70 (2006) (citing *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). Brown fails to demonstrate the buttons with Hanson's picture meet this standard, as is more fully discussed in Ground 5.

(ECF No. 19-1 at 72-73.) The Nevada Supreme Court's rejection of Brown's claims was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Turning initially to the alleged prosecutorial misconduct claim, as was mentioned in Ground 1(a), Lang was arrested shortly after the shooting on unrelated charges and wrote letters to another inmate while incarcerated. (*See* ECF No. 47-27 at 18, 20.) In one letter, Lang wrote:

> if they think it was planned, then they will think I was in on it because [Hanson] was with me that night. I am just waiting for them to bring up formal charges. They don't really have a case against me, but if they think it was planned, and they are opening saying that they do, they might think that will scare me into telling on him.

(*Id.* at 18-19.) Brown contends that this letter demonstrates that the State harassed and threatened Lang to influence her prospective testimony. (ECF No. 112 at 64.)

The Nevada Supreme Court reasonably concluded that Brown failed to demonstrate deficiency on the part of his appellate counsel for failing to include a claim of prosecutorial misconduct in his direct appeal regarding Lang's comments in her letter. *Strickland*, 466 U.S. at 688; *Smith*, 528 U.S. at 285. In order to demonstrate "[u]ndue prosecutorial interference in a defense witness's decision to testify," it must be shown that "the prosecution intimidate[d] or harasse[d] the witness to discourage the witness from testifying, for example, by threatening the witness with prosecution for perjury or other offenses." *Williams v. Woodford*, 384 F.3d 567, 601-02 (9th Cir. 2004). And "[t]he prosecution's conduct must amount to a substantial interference with the defense witness's free and unhampered determination to testify before the conduct violates the defendant's right to due process." *Id.* at 602. As the Nevada Supreme Court reasonably determined, Brown fails to demonstrate that the State intimidated or harassed Lang. Although Lang

1    expresses concern that she might be charged since she was with the victim prior to the shooting, it

2    does not appear that these fears stem from anything the State did or said to her.

3           And turning next to the change of venue claim, on February 4, 2002, Georgette Byrd,

4    Hanson's sister and a relief court clerk for the Eighth Judicial District Court for the State of

5    Nevada, wrote a letter to the judge presiding over Brown's case. (*See* ECF No. 13-3 at 56.) Byrd

6    wrote the letter in response to a motion for release or bail reduction filed by Brown prior to trial.

7    (*Id.*) In the letter, Byrd petitioned for Brown to remain in jail until his trial, citing, in part, her "own

8    fear[s] of this man." (*Id.*) Byrd later testified at Brown's trial as a character witness, explaining, in

9    part, that Brown called her several years before the shooting in 1996 to report that "he just

10   snapped" and Hanson was at the hospital with multiple injuries.[7] (ECF No. 6-2 at 28, 31-32.)

11          Again, the Nevada Supreme Court reasonably concluded that Brown failed to demonstrate

12   deficiency on the part of his appellate counsel for failing to include a change of venue claim in his

13   direct appeal. *Strickland*, 466 U.S. at 688; *Smith*, 528 U.S. at 285. As the Nevada Supreme Court

14   reasonably determined, Brown fails to demonstrate that the underlying claim had a reasonable

15   likelihood of success. "Due process requires that the accused receive a fair trial by an impartial

16   jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Although Byrd

17   may have written a letter to the state district court prior to Brown's hearing, there is no showing

18   that the letter or Byrd's testimony at the trial impinged on Brown's right to a fair trial.

19          Because the Nevada Supreme Court reasonably denied these two claims, Brown is denied

20   federal habeas relief for Ground 1(i).

21

22

---

23   [7] Although not directly related to the issue at hand, it is worth nothing that Byrd's husband, Gary Byrd, also testified at Brown's trial. (*See* ECF No. 10-1 at 15.) Gary's testimony is more fully discussed in Ground 3.

## B.    Ground 2

In Ground 2, Brown alleges that the state district court failed to instruct the jury as to his theory of the case and instead used improper jury instructions that allowed him to be convicted upon proof less than beyond a reasonable doubt, that impermissibly shifted the burden of proof, and that failed to properly identify the elements of the crime. (ECF No. 31 at 29.) In its order affirming Brown's judgment of conviction, the Nevada Supreme Court held:

> Because "[t]he district court has broad discretion to settle jury instructions," this court will review the district court's decision to give a particular instruction for an abuse of discretion. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001). A criminal defendant is entitled to have the jury instructed on his theory of the case, no matter how weak or incredible the evidence supporting the theory may be. *Barron v. State*, 105 Nev. 767, 773, 783 P.2d 444, 448 (1989). "Jury instructions should be clear and unambiguous." *Culverson v. State*, 106 Nev. 484, 488, 797 P.2d 238, 240 (1990) (concluding that an instruction on self-defense as a justification for homicide was erroneous and potentially prejudicial because it was unclear, ambiguous, and may have misled the jury); *see also Vallery v. State*, 118 Nev. 357, 372, 46 P.3d 66, 77 (2002). Furthermore, the defendant is entitled to a jury instruction sufficiently specific to apprise the jury of the State's burden of proof. *Barone v. State*, 109 Nev. 778, 781, 858 P.2d 27, 29 (1993). However, if proffered instructions are adequately covered by other instructions, they need not be given. *Barron*, 105 Nev. at 773, 783 P.2d at 448. A defendant does not possess the absolute right to have his own instructions given. *Milton v. State*, 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995) (citing *Stroup*, 110 Nev. at 529, 874 P.2d at 771).
>
> Here, the district court's instructions were not sufficiently specific to apprise the jury as to the State's burden of proof on Brown's accident defense. Instruction 5 stated in relevant part, "Malice aforethought . . . denotes . . . an unlawful purpose and design in contradistinction to accident and mischance." Instruction 23 unambiguously stated, "An act is not unlawful if it is committed through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence." Instruction 25 instructed the jury that the State bears the burden of proving beyond a reasonable doubt every material element of the crime charged.
>
> While these instructions clearly and specifically inform the jury that the concepts of "malice aforethought" and "unlawful" exclude accident, misfortune, or mischance, and the State must demonstrate malice aforethought beyond a reasonable doubt, they do not inform the jury that the State has the burden of disproving accident beyond a reasonable doubt. Pursuant to *Crawford*, general material element instructions that address the defendant's theory of the case by inference are no longer sufficient grounds for rejecting a more specific defense

instruction on the State's burden of proof. 121 Nev. at ___, ___ P.3d at ____. Therefore, we conclude that the district court erred in refusing to give the proffered instruction.

Failure to give a "significant" instruction under *Crawford* is subject to a harmless error analysis. *Id.* at ___, ____ P.3d at ____. We conclude that overwhelming evidence supports that this was a non-accidental shooting and that the refusal to give the significance instruction was harmless beyond a reasonable doubt. As noted below, several witnesses testified that Brown had beaten Hanson on multiple occasions over a five-year period. Other witnesses testified to being attacked or threatened by Brown for either attempting to protect Hanson or having a relationship with Hanson. Brown had previously threatened Hanson with a gun. Forensic experts testified that Hanson's wounds could not have been caused by an accidental discharge of the shotgun and that the shotgun did not malfunction or accidentally discharge when tested. In addition, Brown told various people several different versions of what happened. One version was that he shot Hanson accidentally thinking she was an intruder, as opposed to accidentally discharging the shotgun. Finally, we note that, while the jury instructions did not clearly indicate that the State had the burden to disprove accident, the instructions did clearly state that malice aforethought, an essential element of murder, does not exist in an accidental act. We conclude that the failure to give a "significance" instruction was harmless beyond a reasonable doubt.

(ECF No. 12-2 at 70-72.) The Nevada Supreme Court's rejection of Brown's claims was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Brown's proposed jury instructed provided as follows: "[i]f the State has failed to prove beyond a reasonable doubt that this was not an accident, then the Defendant is entitled to a verdict of not guilty."[8] (ECF No. 9-3 at 29.) The state district court refused to give the instruction, indicating that it did not "think that's the law." (ECF No. 10-2 at 14.) As the Nevada Supreme

---

[8] And in the alternative, Brown proposed the following instruction:

If the State has failed to prove beyond a reasonable doubt that the killing in this case was not either an accident nor caused by misfortune, then the defendant is entitled to a verdict of not guilty. Acts which are the result of either evil purpose, intention or culpable negligence are not legally considered to be accidents or the result of misfortune.

(ECF No. 9-3 at 30.)

Court reasonably determined, this decision was erroneous. Without Brown's proposed instruction, the jury instructions were not sufficiently specific to apprise the jury that the State had the burden of disproving the accidental nature of the shooting beyond a reasonable doubt. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979) (disallowing burden-shifting that relieves the state of its burden of proving every element beyond a reasonable doubt); *In re Winship*, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (explaining that issues related to jury instructions are cognizable in federal habeas corpus when they violate due process).

The harmless-error standard[9] applied by the Nevada Supreme Court was the harmless-error standard for federal constitutional violations articulated in *Chapman v. California*, 386 U.S. 18 (1967). *See Crawford v. State*, 121 Nev. 744, 756 n.30, 121 P.3d 582, 590 n.30 (2005) (citing to *Chapman* for the standard applied). The applicable test for whether a federal constitutional error was harmless varies with the procedural posture of the case. *Davis v. Ayala*, 576 U.S. 257, 267 (2015). On a direct appeal, the standard from *Chapman* governs. Under *Chapman*, the burden is on the prosecution to prove beyond a reasonable doubt that the error did not contribute to the

---

[9] Brown argues that the error was structural, and, as such, it defies analysis by harmless-error standards. (*See* ECF No. 112 at 69-70 (citing *Sullivan v. Louisiana*, 508 U.S. 275 (1993).) This court disagrees. Unless the jury instruction error "'vitiates *all* the jury's findings' and produces 'consequences that are necessarily unquantifiable and indeterminate,'" harmless error analysis is appropriate. *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal citation omitted) (emphasis in original) (concluding that "the omission of an element is an error that is subject to harmless-error analysis").

verdict, such that the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. 386 U.S. at 24. Under *Chapman*, an error is not harmless if there is a reasonable possibility that the error might have contributed to the conviction. *Id.*

In contrast, on collateral review, such as in the present action, the standard from *Brecht v. Abrahamson*, 507 U.S. 619, (1993), instead controls. Under *Brecht*, the record must demonstrate that the error resulted in actual prejudice. *E.g., Ayala*, 576 U.S. at 267. Federal habeas relief is appropriate under this standard only if the court has grave doubt whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* at 267-68. *Brecht* requires more than *Chapman*'s reasonable possibility that the error might have contributed to the conviction, and the court instead must find that the defendant sustained actual prejudice from the error. *Id.* at 268.

Under AEDPA, a federal court may not overturn a state court harmless-error determination unless the state court applied the *Chapman* standard in an objectively unreasonable manner. However, application of the *Brecht* standard subsumes the inquiry of whether the state court's application of the *Chapman* standard was objectively unreasonable. *See Ayala*, 567 U.S. at 268. That is, if the record demonstrates that the error was not harmless under *Brecht*, the petitioner will have established that the state court's application of *Chapman* was objectively unreasonable under AEDPA's deferential standard of review. *See, e.g., Fry v. Pliler*, 551 U.S. 112, 119-20 (2007); *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017).

In the present case, the state court record does not demonstrate that Brown sustained actual prejudice as a result of the error. The jury was astutely aware that Brown's defense was that he shot Hanson accidentally, the jury was instructed to find Brown guilty of first-degree murder only if it determined that he unlawfully killed Hanson, the jury was instructed that an accident was not

lawful, and the jury was instructed that Brown was presumed innocent and that the State carried the burden of proof. (*See* ECF No. 5-4 at 31 (Brown's opening statement that "[t]his was an accident. It was a tragic accident, but it was an accident nonetheless"); ECF Nos. 44-5 at 5 (instruction explaining that "[m]urder is the unlawful killing of a human being, with malice aforethought, whether express or implied"); ECF No. 44-5 at 5 (instruction explaining that "[a]n act is not unlawful if it is committed through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence"); ECF No. 44-5 at 26 (instruction explaining that "[t]he Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense").) Given these facts and the fact that the jury found Brown guilty of first-degree murder (*see* ECF No. 11-2 at 41), this court cannot conclude that there was a reasonably probability that the jury would have arrived at a different verdict had it been explicitly informed that the State had the burden of disproving that the shooting of Hanson was accidental. Instead, given the facts of the case, which are discussed throughout this order, it is readily apparent that the jury rejected Brown's accident defense. Accordingly, because the error was harmless under the *Brecht* standard, the Nevada Supreme Court's application of the *Chapman* harmless-error standard was neither contrary to nor an objectively unreasonable application of clearly established federal law. Brown is denied federal habeas relief for Ground 2.

### C.    Ground 3

In Ground 3, Brown alleges that the state district court improperly admitted prior bad act evidence. (ECF No. 31 at 38.) Specifically, Brown argues that the state district court erroneously admitted four prior bad acts: a domestic battery occurring on August 12, 1996; a battery occurring

on February 22, 1999; an incident where he put a shotgun to Hanson's head; and his general history of domestic violence against Hanson. (*Id.* at 39.) In its order affirming Brown's judgment of conviction, the Nevada Supreme Court held:

> Brown asserts that, because his defense was that the shooting was an accident, the prior bad acts, which allegedly occurred months or even years before the shooting, had no bearing on his motive or intent at the time of the shooting. [Footnote 14: In addition to the acts specifically discussed in this order, Brown contended that the district court erred in admitting evidence of: (1) an altercation in 1998 between Brown and Hanson's father when the father tried to intervene, (2) threats made by Brown to a Guy Powell in 2001 warning Powell to stay away from Hanson, and (3) Brown's conversation with a Gary Byrd in 2001 that Brown was upset because he thought Hanson was pregnant by another man. We have considered Brown's arguments and find them to be without merit.]
>
> Evidence of other prior bad acts may be admitted at trial to show: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." NRS 48.045(2). Before admitting such evidence, the district court must conduct a hearing on the record and determine that: (1) the evidence is relevant to the crime charged, (2) the other act is proven by clear and convincing evidence, and (3) the probative value of the other act is not substantially outweighed by the danger of unfair prejudice. *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997). This court gives great deference to a district court's decision to admit or exclude evidence and will not reverse the district court's decision absent manifest error. *See Bletcher v. State*, 111 Nev. 1477, 1480, 907 P.2d 978, 980 (1995).
>
> First, Brown asserts that the district court erred in admitting prior bad act evidence of an incident in which Brown kicked Hanson in the head and back, while telling her that he would kill her if she saw another man. Brown asserts that this incident, which occurred more than five years prior to the shooting, was too remote in time and was extremely prejudicial. The State asserts that the evidence tended to show that the shooting was no accidental.
>
> Evidence of Brown's prior bad act is relevant to the crime charged because it tends to show motive, i.e., his jealousy over Hanson, and an absence of mistake. Substantial evidence supports the district court's finding that the act was proven by clear and convincing evidence and the probative value was not substantially outweighed by its prejudicial affect. However, the statement was testimonial under the recent decision of *Crawford v. Washington*, 541 U.S. 36 (2004), and therefore inadmissible. Nevertheless, due to the overwhelming evidence supporting Brown's convictions, we conclude that this error was harmless. *Richmond v. State*, 118 Nev. 924, 934, 59 P.3d 1249, 1255 (2002).

Second, Brown contends that the district court erred in admitting prior bad act evidence of an incident in which Brown accused Michael Mikrut of having sexual relationship with Hanson and hit him in the head, inflicting an injury requiring stitches. Brown asserts that the incident, which occurred approximately eighteen months prior to the shooting of Hanson, was too remote in time and not relevant. The State contends that the evidence was relevant to show his motive of jealousy. We agree. The record reflects the district court did not err in admitting this evidence.

Third, Brown argues that the district court erred in admitting a letter, written by Hanson, which discusses Brown holding a shotgun to Hanson's head, because the danger of undue prejudice substantially outweighed the probative value. He contends that the State failed to prove the bad act by clear and convincing evidence, which violated his Sixth Amendment right to cross-examination, U.S. Const. amend. VI, because the only proof available on this point was inadmissible hearsay.

The letter is relevant because it tends to show an absence of mistake or accident contradicting Brown's defense. The evidence was proven by clear and convincing evidence because Gary Byrd, Hanson's brother-in-law, authenticated the letter based on Hanson's handwriting and Avianne Davis, Brown's niece, testified that Brown had pointed a large gun at Hanson during a dispute around that time. We conclude that the letter was admissible under the general hearsay exception, as its nature and the special circumstances under which it was made offered strong assurances of accuracy and the deceased was unavailable as a witness. [Footnote 21: *See* NRS 51.315. We also note that the letter did not constitute testimonial evidence under the Supreme Court's decision in *Crawford v. Washington*.] We conclude that the district court did not err in finding that the evidence's probative value is not substantially outweighed by the danger of unfair prejudice and admitting the evidence.

Fourth, Brown contends that the district court erred in admitting general evidence of Brown's history of violence and general observations by witnesses that Hanson had black eyes or cuts. He argues that the district court erred in admitting evidence that he has a temper, that he snaps when he gets angry, that he is extremely violent, that he is prone to violence, that he is a bad guy and that his relationship with Hanson was violent and argumentative. We agree.

While specific incidents of violence were admissible, the general character evidence was not. However, any error in admitting this evidence was harmless beyond a reasonable doubt in light of the admissible evidence of specific incidents of violence.

Fifth, Brown contends that the district court erred in admitting evidence that he kicked Georgeann Mayne, Hanson's mother, in the face. We disagree. Mayne described this incident in relationship to her attempt to shop Brown from hitting Hanson in May 2000. The record reflects substantial evidence to support the district

court's finding that the incident was proven by clear and convincing evidence, that it was relevant to absence of mistake or accident and that its probative value was not substantially outweighed by its prejudicial effect.

(ECF No. 12-2 at 73-76.)[10] The Nevada Supreme Court's rejection of Brown's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Turning first to the August 12, 1996, domestic battery incident, Officer Rick Barela testified that he responded to the Lake Mead Hospital on that date "on a call of a domestic battery victim that was in the emergency room at the hospital." (ECF No. 6-2 at 16-18.) Hanson was the domestic violence victim, and "[s]he was visibly upset, still crying, appeared to be in pain, very distraught." (*Id.* at 18.) Officer Barela observed an "injury on her shoulder, . . . her knee, and . . . on the back of her head near the crown of her head." (*Id.* at 18-19.) Officer Barela then read Hanson's statement that he had written for her:

> This started about three weeks ago. I told [Brown] that I was not happy and I was going to leave him. He said that if he saw me with another man he would kill me. He went to my work today and started to threaten me. He - - and then in quotes, if you don't tell me the truth, I'm going to kill you, unquote. He accused me of cheating on him. My co-worker called the police. His mom came to work to bring me the car keys. She arranged a meeting with [Brown] and me to talk at 3785 Lone Oak. I went there about 7 p.m. or a little after. When I got there, we went to the bedroom and we talked. I told him that I wanted to leave him. He got very angry and started tripping out. I told him I was going to call my sister. He grabbed me by the left arm. Both his parents told him to stop. He kept pulling me. I made it outside and I fell to the ground and he started kicking me in the head. He kicked me in the back and I couldn't get up and walk. My legs were numb and they wouldn't work. I noticed my hair had blood and was matted together. I was on the ground and couldn't get up. He left in the car. My mother-in-law took me to the hospital.

---

[10] And in affirming the denial of Brown's state habeas petition, the Nevada Supreme Court held: "appellant claims that . . . the trial court erred in admitting evidence of appellant's prior bad acts. . . . [This] claim[ was] considered and rejected on direct appeal. The doctrine of the law of the case prevents further litigation of th[is] claim[ ]." (ECF No. 49-25 at 10.)

(*Id.* at 23-24.)

Turning next to the February 22, 1999, battery, Michael Mikrut testified that he met Hanson in February of 1999, through Hanson's father, while he was visiting from Wisconsin. (ECF No. 6-3 at 18-19.) On February 22, 1999, Brown "came into the room [where Mikrut was staying at Hanson's father's house] yelling obscenities at [him] accusing [him] of having relations with [Hanson] and then he struck [Mikrut] twice on the forehead." (*Id.* at 21.) Mikrut needed "numerous stitches" from the attack, as "there were two gashes on [his] forehead." (*Id.*)

Moving to the shotgun incident, Gary Byrd, Hanson's brother-in-law, testified that he found a letter Hanson had written to Brown, which was dated August 22, 2000. (ECF No. 10-1 at 21, 24-25.) In that letter, Hanson indicated, in part, that Brown had "cocked a shotgun at her head." (*Id.* at 26.) Hanson then stated, "I'm going to end up dead one day fucking around with you," and "our shit is getting too scary and out of control." (*Id.* at 26.)

Finally, regarding Brown's domestic violence evidence generally, Gary Byrd testified that Hanson and Brown had a "hostile, volatile type relationship" and that Hanson had bruises on different occasions from domestic violence incidents with Brown. (ECF No. 10-1 at 16-17.) Likewise, Guy Powell testified that he was in a three-week relationship with Hanson during a break in Hanson and Brown's relationship. (ECF No. 6-3 at 9-11.) Powell explained that Brown stalked Hanson and that Brown had called him on several occasions in February 1997, threatening him. (*Id.* at 12.) Similarly, Douglas Hanson (hereinafter "Douglas"), Hanson's father, testified that Brown and Hanson's relationship "was a very rock relationship, a very violent relationship, it wasn't a good thing." (ECF No. 6-3 at 28, 30.) Douglas had "seen [Hanson] with various cuts, bruises, black eyes . . . on numerous occasions." (*Id.* at 30.) At one point in 1998, when Hanson and Brown were living with him, Douglas heard "a smack on the wall." (*Id.* at 31.) He went to

Hanson and Brown's bedroom and saw Hanson "on the floor, [and Brown] was standing over top of her screaming at her." (*Id.*)

Like Douglas, George Ann Mayne, Hanson's mother, also testified about her daughter's relationship with Brown, describing it as "usually very violent [on Brown's part], arguing all the time, unsettled, destructive." (ECF No. 6-4 at 31, 33.) Mayne described an incident in 1999 where she received a telephone call from Hanson asking Mayne to pick her up. (ECF No. 7-1 at 1-2.) Mayne heard Brown in the background of that telephone call, "cussing and yelling, and telling [Hanson] to get off the freaking phone." (*Id.* at 2.) Mayne also heard Hanson "say, don't hit me with that." (*Id.*) When Mayne arrived, Hanson "had blood coming from her nose and she had a cut by her eye." (*Id.* at 3.) And on another occasions on May 6, 2000, Mayne brought Hanson home from a party, and Brown and Hanson started fighting. (*Id.* at 4-6.) Mayne then saw Brown's "hands around [Hanson's] neck," and when Mayne tried to break his hold, Brown "grabbed [Mayne] by the throat" and later kicked her in the face. (*Id.* at 7.) Mayne also testified that Brown "threatened to burn [her] house down, he threatened to have his homies kill [her] or shoot [her], blow [her] away." (*Id.* at 19.)

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). Thus, the issue before this court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due

process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

Although the foregoing bad act testimony presented Brown in an undesirable light, it cannot be concluded that it rendered Brown's trial fundamentally unfair in violation of his due process rights. *Estelle*, 502 U.S. at 67; *Sublett*, 63 F.3d at 930; *Jammal*, 926 F.2d at 920. As the Nevada Supreme Court reasonably determined, the foregoing evidence tended to show motive— his jealousy regarding Hanson—and an absence of mistake or accident. Therefore, there was a permissible inference to be drawn from the admission of the evidence. *Jammal*, 926 F.2d at 920. And more importantly, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And significantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*. Accordingly, because the Nevada Supreme Court reasonably denied Brown relief on this claim, Brown is denied federal habeas relief for Ground 3.[11]

---

[11] This court would reach the same result even under a *de novo* review, which Brown urges is appropriate given his argument that the Nevada Supreme Court never adjudicated the merits of his due process claim. (*See* ECF No. 112 at 80.)

Brown also argues that although the Nevada Supreme Court reasonably determined that the admission of the contents of Hanson's August 22, 2000, letter violated his right to confront the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**D.     Ground 4**

In Ground 4, Brown alleges that the state district court improperly disallowed Casias from testifying that he believed the shooting was an accident. (ECF No. 31 at 42.) In its order affirming Brown's judgment of conviction, the Nevada Supreme Court held:

> Brown argues that the district court erred by not allowing Lawrence Casias's lay opinion testimony that the shooting was an accident.
>
> This court will not overturn a district court's decision to admit or exclude evidence absent manifest error. *Collman v. State*, 116 Nev. 687, 702, 7 P.3d 426, 436 (2000). To be admissible, lay witness opinion testimony must be: (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. NRS 50.265.
>
> Although Casias did not see Brown for at least ten seconds prior to the shooting, he heard the events surrounding the shooting and he observed Brown shortly before the shooting and immediately after. We conclude that Casias's opinion that the shooting was an accident was rationally based on his perceptions. Because Casias's opinion may have assisted the jury, we conclude that the district court erred by excluding the testimony. However, given the overwhelming evidence adduced against Brown, we conclude the error was harmless.

(ECF No 12-2 at 77-78.) The Nevada Supreme Court's rejection of Brown's claims was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Lawrence Casias testified that he lived above Brown at the Oasis Springs Apartments. (ECF Nos. 7-1 at 33, 7-2 at 2-3.) Casias and Brown were friends and had known each other for about a month and a half prior to the shooting. (ECF No. 7-2 at 4-5.) Casias was at Brown's apartment on the evening of September 7, 2001, playing cards with Brown and several other

---

witnesses against him, the Nevada Supreme Court erred in finding that the violation was harmless. (*See* ECF No. 112 at 86-87.) However, Brown appears to be mistaken about the Nevada Supreme Court's determination, as it actually concluded "that the letter did *not* constitute testimonial evidence under the Supreme Court's decision in *Crawford v. Washington*." (ECF No. 12-2 at 75 n.21 (emphasis added).)

individuals, including Hanson. (*Id.* at 6, 8.) At one point during the evening, Brown left the apartment, and a little while later, Hanson left and walked to a bus stop. (*Id.* at 13-15.) When Brown returned and realized Hanson had left, he asked his guests to leave. (*Id.* at 15.) Casias left with two other individuals and went to one of their residences for several hours. (*Id.* at 17-18.)

Casias returned to the Oasis Springs Apartments later that night and ran into Brown. (*Id.* at 18-19.) Brown asked Casias if he had seen Hanson, and Casias responded that he had not seen her. (*Id.* at 19.) Brown then asked Casias to return to his apartment with him. (*Id.* at 20.) As Casias and Brown approached his apartment, Brown pointed to the window, indicated that the shades were moving, and said "there's somebody in [his] house." (*Id.* at 23-24.) Once Brown and Casias were in Brown's apartment, Brown "put[ ] down his stuff and grab[bed] the gun." (*Id.* at 25.) Brown then said he was "gonna shoot somebody, they're in [his] house." (*Id.* at 27.) Brown "walked down toward the northwest bedroom," and Casias lost sight of him. (*Id.* at 27-28.) "About ten seconds" later, Casias heard Hanson say Brown's name, and then after two or three more seconds, he heard a gunshot. (*Id.* at 28-29.) Brown then walked back out into the living room, told Casias that he had shot Hanson, and dropped the gun. (*Id.*) Casias and Brown then ran out of the apartment. (*Id.* at 30.)

Following Casias's testimony, Brown's trial counsel made a record of a question he intended to ask Casias on cross-examination. (ECF No. 8-2 at 20.) The state district court summarized the issue as follows:

> you wanted to ask Mr. Casias about his opinion as to whether this was an accident, and my ruling is NRS 50.265 talking about lay witnesses not being able to testify as to opinion testimony. . . . I think that the foundation was certainly laid for each side to argue that it was an accident or not an accident, but I don't think that we needed Mr. Casias' opinion.

(*Id.* at 20-21.)

As the Nevada Supreme Court reasonably determined, this decision to limit Casias's testimony was erroneous. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (explaining that an accused "has the right to present his own witnesses to establish a defense" and that "[t]his right is a fundamental element of due process of law"); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."). Therefore, like Ground 2, where the Nevada Supreme Court also determined that the error was harmless, federal habeas relief is appropriate under *Brecht* only if this court has grave doubt whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *Ayala*, 576 U.S. at 267-68.

Here, the state court record does not demonstrate that Brown sustained actual prejudice as a result of the error. Ernie Sandoval, Casias's cousin, testified at Browns' trial that he spoke with Casias following the shooting, and Casias had told him that the shooting "was an accident, that [Brown] was looking the other way and she said something and he turned around and it went off." (ECF Nos. 9-2 at 18, 22; 9-3 at 7-8.) Thus, even if Casias was limited from testifying that he believed the shooting was an accident, his belief was still presented to the jury through Sandoval's testimony. Given this fact, this court cannot conclude that there was a reasonably probability that the jury would have arrived at a different verdict had Casias's testimony not been improperly limited. Accordingly, because the error was harmless under the *Brecht* standard, the Nevada Supreme Court's application of the *Chapman* harmless-error standard was neither contrary to nor

45

1  an objectively unreasonable application of clearly established federal law. Brown is denied federal

2  habeas relief for Ground 4.

3      **E.      Ground 5**

4          In Ground 5, Brown alleges that the state district court improperly permitted spectators at

5  his trial to wear buttons with Hanson's picture on them. (ECF No. 31 at 43.) In Ground 1(h), Brown

6  alleged a related claim: his appellate counsel was ineffective for failing to include this button issue

7  in his direct appeal. In affirming the denial of that claim, the Nevada Supreme Court did not appear

8  to address the merits of the underlying issue, focusing instead on the *Strickland* prejudice prong.

9  (*See* ECF No. 19-1 at 71-72.) As such, this court reviews this claim *de novo*. *See Cone v. Bell*, 556

10 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

11         Brown must demonstrate that the state district court's allowance of the buttons with

12 Hanson's picture on them to be worn by spectators deprived him of a fair trial. *See Estelle v.*

13 *Williams*, 425 U.S. 501, 503-06 (1976). At the time of Brown's trial, "the effect of a defendant's

14 fair-trial rights of . . . spectator conduct . . . [was] an open question." *Carey v. Musladin*, 549 U.S.

15 70, 76 (2006) (explaining that "[t]his Court has never addressed a claim that such private-actor

16 courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial").

17 However, the Ninth Circuit Court of Appeals had provided that the question to be answered in this

18 situation was "whether 'an unacceptable risk [was] presented of impermissible factors coming into

19 play.'" *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (quoting *Williams*, 425 U.S. at 505); *see also*

20 *Norris v. Risley*, 918 F.2d 828, 830 (9th Cir. 1990) (applying *Flynn* and holding that spectators'

21 buttons saying "Women Against Rape" worn during a trial deprived the defendant of a fair trial).

22         It cannot be concluded that various spectators wearing pictures of Hanson deprived Brown

23 of a fair trial, especially where there was no dispute that Brown shot and killed Hanson. The issue

46

at Brown's trial was whether the shooting was accidental or not, and spectators wearing pictures of Hanson did not touch upon this issue. Brown is denied federal habeas relief for Ground 5.

### F.     Ground 7

In Ground 7, Brown alleges that the state district court failed to sua sponte change the venue and implement procedures to ensure a fair trial. (ECF No. 31 at 47.) As was mentioned in Ground 1(i), Brown presented this claim in his state habeas petition as an ineffective-assistance-of-appellate-counsel issue, and the Nevada Supreme Court held, in part, that Brown "fail[ed] to demonstrate that the underlying claim had a reasonable likelihood of success on appeal." (ECF No. 19-1 at 72.) As this court discussed in Ground 1(i), this ruling was reasonable. As such, Brown is denied federal habeas relief for Ground 7.

### H.     Ground 8

In Ground 8, Brown alleges that the cumulative effect of the errors demonstrated in his petition rendered the proceedings against him devoid of fundamental fairness and resulted in a constitutionally unreliable sentence. (ECF No. 31 at 48.) The Nevada Supreme Court previously held that the Brown "fail[ed] to demonstrate a reasonable probability of a different outcome even when the alleged errors of counsel [were] considered cumulatively." (ECF No. 19-1 at 71.) This ruling was reasonable.

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

1   As the Nevada Supreme Court reasonably concluded, even considering the alleged errors

2   cumulatively, this court cannot conclude that Brown was prejudiced, warranting federal habeas

3   relief. Brown is denied federal habeas relief for Ground 8.

4   **IV.   CERTIFICATE OF APPEALABILITY**

5           This is a final order adverse to Brown. Rule 11 of the Rules Governing Section 2254 Cases

6   requires this court issue or deny a certificate of appealability (COA). As such, this court has *sua*

7   *sponte* evaluated the remaining claims within the petition for suitability for the issuance of a COA.

8   *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to

9   28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial

10  showing of the denial of a constitutional right." With respect to claims rejected on the merits, a

11  petitioner "must demonstrate that reasonable jurists would find the district court's assessment of

12  the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

13  *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue

14  only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of

15  a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

16          Applying these standards, this court finds that a certificate of appealability is warranted for

17  Ground 1(b). Reasonable jurists could debate whether Brown was prejudiced by his trial counsel's

18  failures regarding Irwin, especially since Irwin's testimony that there was a high likelihood of a

19  shotgun with an ill-fitting stock to be fired inadvertently would have been abundantly valuable to

20  Brown's defense. Thus, reasonable jurists could debate whether Brown demonstrates that his Sixth

21  Amendment right to the effective assistance of trial counsel was violated. And due to the

22  substantiality of this ineffective assistance claim, reasonable jurists could then debate whether

23  Brown has demonstrated cause—the ineffectiveness of his post-conviction counsel in failing to

assert this ground in his state post-conviction proceedings—and prejudice to excuse the claim's procedural default.

This court denies a certificate of appealability for Brown's other grounds.

**V.    CONCLUSION**

In accordance with the foregoing, **IT IS THEREFORE ORDERED**:

      1.     The petition (ECF No. 31) is DENIED.

      2.     A certificate of appealability is GRANTED for Ground 1(b) and DENIED for the remaining grounds.

      3.     The clerk of the court is directed to enter judgment accordingly.

Dated:  September 7, 2021.

_____
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE